[Cite as *Mourton v. Finn*, 2012-Ohio-3341.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

MARK MOURTON

    Appellant

    v.

BRUCE S. FINN, et al.

    Appellees

C.A. No.    26100

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CV 2010 08 5309

DECISION AND JOURNAL ENTRY

Dated: July 25, 2012

BELFANCE, Judge.

{¶1} Plaintiff-Appellant Mark Mourton appeals the trial court's award of summary judgment to Defendant-Appellee Bruce Finn and Defendant-Appellee BMJ, LTD, as well as its denial of his motion for summary judgment. For the reasons set forth below, we reverse and remand the matter for further proceedings.

I.

{¶2} Mr. Finn and Mr. Mourton were partners in BMJ. Mr. Finn owned 50% of the company while Mr. Mourton and a third partner split the remaining ownership. BMJ owned a single property, which was leased to ActionLink, another of Mr. Finn's companies. In July 2007, Mr. Mourton and Mr. Finn began discussing Mr. Finn buying out Mr. Mourton's 25% ownership in BMJ. However, the men disagree as to what prompted the discussions. Mr. Finn claims that Mr. Mourton approached him, asking to be bought out due to money troubles. Mr. Mourton, on the other hand, claims that Mr. Finn made an unsolicited call to him looking to buy

his share of the company. The two men entered into an agreement on September 6, 2007, in which Mr. Finn agreed to buy Mr. Mourton's share of BMJ for $15,000.

{¶3} However, on August 13, 2007, unknown to Mr. Mourton, Mr. Finn had met with representatives of Akron to discuss purchasing a new property for ActionLink, which he believed had outgrown the property owned by BMJ. Mr. Finn determined that, in order to buy the new property from Akron, he would have to sell the property owned by BMJ. He floated the idea to the City that Akron would buy the BMJ property and that there would be a dual closing so that he could apply the proceeds directly to the new building he was buying from Akron. However, the parties dispute when these negotiations began. Akron eventually bought the BMJ property for $1.3 million.

{¶4} Mr. Mourton filed a complaint against Mr. Finn and BMJ, alleging that Mr. Finn had breached his fiduciary duty, had negligently misrepresented the negotiations regarding the sale of the BMJ property to Akron, and had committed fraud. Mr. Mourton also sought to rescind the agreement in which Akron had purchased the BMJ property. Following a discovery period during which Mr. Finn and BMJ repeatedly failed to comply with Mr. Mourton's requests, Mr. Mourton moved for summary judgment on his breach of fiduciary duty claim, and the defendants moved for summary judgment on all counts.

{¶5} The trial court denied Mr. Mourton's motion and granted the defendants' motion. Mr. Mourton has appealed raising five assignments of error for our review.

II.

ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN GRANTING APPELLEES' MOTION FOR SUMMARY JUDGMENT AS TO COUNT ONE OF APPELLANT MINORITY MEMBER'S COMPLAINT[.]

ASSIGNMENTS OF ERROR II AND III[1]

THE TRIAL COURT IMPROPERLY GRANTED APPELLEES' MOTION FOR SUMMARY JUDGMENT AS TO COUNTS TWO AND THREE OF APPELLANT MINORITY MEMBER'S COMPLAINT[.]

ASSIGNMENT OF ERROR IV

THE TRIAL COURT IMPROPERLY GRANTED APPELLEES' MOTION FOR SUMMARY JUDGMENT AS TO COUNT FOUR OF APPELLANT MINORITY MEMBER'S COMPLAINT[.]

ASSIGNMENT OF ERROR V

THE TRIAL COURT IMPROPERLY DENIED APPELLANT'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT ONE OF APPELLANT MINORITY MEMBER'S COMPLAINT[.]

{¶6} This Court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). "We apply the same standard as the trial court, viewing the facts in the case in the light most favorable to the non-moving party and resolving any doubt in favor of the non-moving party." *Garner v. Robart*, 9th Dist. No. 25427, 2011–Ohio–1519, ¶ 8. However, while an appellate court applies the same standard as the trial court, it "has a different focus than the trial court." *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 360 (1992). "The trial court's judgment entry and reasoning are part of the de novo review process [because,] [e]ven though a reviewing court is not required to defer to the trial court's reasoning, the trial court's analysis often has a persuasive effect during appellate review." *Scassa v. Dye*, 7th Dist. No. 02CA0079, 2003-Ohio-3480, ¶ 21.

{¶7} The trial court's judgment entry in this case is as follows:

This matter came before the Court upon [Mr. Mourton's] Motion for Summary Judgment, Defendants' Response and [Mr. Mourton's] Reply in Support. [Mr. Mourton] moved for summary judgment as to Count 1, breach of fiduciary duties,

---

[1] Though listed separately in his assignment of error page, Mr. Mourton combined these assignments of error in his brief, apparently for purposes of discussion.

only. Similarly, Defendants[] filed a Motion for Summary Judgment, followed by [Mr. Mourton's] Response and Defendants' Reply in Support. Defendants move for summary judgment as to all four counts of [Mr. Mourton's] Complaint.

Upon review of the arguments and case law set forth in the parties' briefs, the attached exhibits and the deposition transcripts[,] the Court denies [Mr. Mourton's] Motion for Summary Judgment as to Count 1 and grants Defendants' Motion for Summary Judgment as to Counts 1, 2, 3, and 4.

(Emphasis deleted.). Summary judgment is properly granted where there is no dispute of material fact and the moving party is entitled to judgment as a matter of law. Pursuant to Civ.R. 56(C), summary judgment evidence includes "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action * * *."

{¶8} This matter presents a complex web of facts and multiple legal issues. In light of the trial court's judgment entry, we find that we cannot properly review the trial court's decision. First, although there appear to be multiple factual disputes, it is unclear which facts the trial court found to be material and undisputed in making its decision. In addition, the trial court's analysis of the law and application of the undisputed material facts to the law is absent. While there are many summary judgment proceedings in which a trial court's reasoning and analysis would be readily apparent from a similar entry (e.g. a foreclosure case involving competing affidavits), this case is not one of them. Over 600 pages of depositions were filed in this case in addition to numerous exhibits. The defendants advanced multiple, alternative grounds for summary judgment in their motion to the trial court. Because of the complexity of this case, the trial court's judgment entry does not give any indication what it actually decided. We also observe that the trial court omitted any reference to having considered the answers to the parties' interrogatories. Thus, it is unclear whether the trial court considered all of the summary judgment materials properly before the court. *See Murphy*, 65 Ohio St.3d at 360 ("If the trial

court does not consider all the evidence before it, an appellate court does not sit as a reviewing court, but, in effect, becomes a trial court.").

{¶9}    This Court has consistently held that it is the trial court's duty to resolve issues in the first instance. *See, e.g., Neura v. Goodwill Industries*, 9th Dist. 11CA0052-M, 2012-Ohio-2351, ¶ 19.  A trial court's failure to review the entire record turns the reviewing court into the trial court on appeal, *see Murphy* at 360, as does a bare-bones judgment entry in a case as complex as this.  It is also unfair to the parties, who are essentially forced to simply refile their summary judgment motions in the appellate court due to being unsure why the trial court rendered the decision it did.  Practically speaking, if a trial court does not set forth any analysis, the parties may just as well file their summary judgment motions in this Court.  Accordingly, so that we may properly function as a reviewing court, we reverse and remand the matter to the trial court.

III.

{¶10}   The judgment of the Summit County Court of Common Pleas is reversed, and the matter is remanded for proceedings consistent with this opinion.

Judgment reversed,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellees.

EVE V. BELFANCE
FOR THE COURT

MOORE, J.
CONCURS.

DICKINSON, J.
DISSENTING.

{¶11} I dissent because I disagree with the majority's refusal to address the merits of this appeal. While I agree with the Seventh District's statement that in ruling on summary judgment motions, a trial court has a duty to "conscientiously examine all the evidence before it," I do not agree that a trial court's failure to adequately explain its reason for granting summary judgment is reversible error. *Scassa v. Dye*, 7th Dist. No. 02CA0779, 2003-Ohio-3480, ¶ 20 (quoting *Murphy v. Reynoldsburg*, 65 Ohio St. 3d 356, 359 (1992)). "[D]e novo review requires an independent review of the trial court's decision without any deference to the trial court's determination." *State v. Consilio*, 9th Dist. No. 22761, 2006-Ohio-649, ¶ 4. In conducting a de novo review, this Court does not rely on the trial court's reasoning or treat it as persuasive authority. The problem in *Murphy* was not that the trial court failed to adequately

state its reasons for granting summary judgment; it was that it failed to carry out its duty to examine the evidence before it. There is nothing that indicates a similar failure by the trial court in this case. My review of the evidence, however, reveals that there are genuine issues of material fact regarding each of Mr. Mourton's substantive claims for relief. Therefore, I would reverse the judgment of the trial court. Remanding this matter at this juncture without addressing the merits merely delays final adjudication and increases the costs for the parties.

{¶12} The parties agree on a number of things. They agree that they formed a limited liability company called BMJ in 2000 for the purpose of acquiring, buying, and selling property. Mr. Finn had a fifty percent interest in BMJ, and Mr. Mourton had a twenty-five percent interest. Another member controlled the final twenty-five percent. The parties also seem to agree that BMJ purchased an office building on Embassy Parkway from the City of Akron in 2000 and Mr. Finn later re-sold the building to the City of Akron without Mr. Mourton's knowledge. They disagree about whether Mr. Finn misrepresented to Mr. Mourton the value of the building or the likelihood of making a profit on it while Mr. Finn was actively seeking to purchase Mr. Mourton's minority share in BMJ.

{¶13} The evidence indicates that Mr. Mourton signed a contract on September 6, 2007, in which he agreed to sell his twenty-five percent interest in BMJ to Mr. Finn for $15,000. The parties agree that Mr. Finn paid Mr. Mourton with three personal checks dated October 17, October 25, and November 2, 2007. In January 2008, Mr. Finn signed a contract on behalf of BMJ, by which BMJ agreed to sell the Embassy building to the City of Akron for $1.375 million dollars. They also agree that Mr. Finn received a check for over $300,000 from the sale of the building after various mortgages were paid off.

{¶14} Mr. Finn is a ninety-five percent shareholder in ActionLink, a company that had leased the Embassy building for the entire time that it was owned by BMJ. The parties agree that Mr. Finn warned Mr. Mourton that ActionLink's expansion would make a move to a bigger facility necessary, which would leave the Embassy building empty. The parties also agree that Mr. Mourton knew that the Embassy building would need to be leased or sold, but they disagree about what Mr. Finn told him or should have told him regarding his efforts to sell the building.

{¶15} Mr. Mourton testified that Mr. Finn called him on July 16, 2007, to tell him that he wanted to buy Mr. Mourton's minority interest in BMJ. According to Mr. Mourton, Mr. Finn told him at that time that the Embassy building would be difficult to lease or sell and that he expected that they would not be able to sell it for the amount they owed on it. Mr. Finn told him that he expected it to sell for something between $800,000 and $850,000 causing a loss of $150,000 to $200,000. Mr. Mourton testified that Mr. Finn told him that he wanted to shield Mr. Mourton from the loss on the building "because we had been involved for 30 years . . . at that time [as business associates] . . . [a]nd he had a plan that would be able to cover the liability of the loss." According to Mr. Mourton, Mr. Finn never told him that he had a potential buyer or that he had received any offer to buy the building. Mr. Mourton testified that he believes that at some time prior to September 6, 2007, when the buyout agreement was signed, Mr. Finn was negotiating with the City of Akron on a deal involving the sale of the Embassy building and that he knew he was likely to make a profit on that sale.

{¶16} Mr. Finn testified that he never mentioned to Mr. Mourton that he was negotiating with the City of Akron on a potential deal for the purchase of the Embassy building, although he did acknowledge that his discussions with the City began while Mr. Mourton was a member of BMJ. Mr. Finn has argued, however, that while Mr. Mourton was a member of BMJ, Mr. Finn

did not know whether the deal with the City would work out and how much the City would eventually pay. Therefore, he could not have known that he would make a profit on the deal. Mr. Finn's potential liability in this case depends on the timing of his negotiations with the City for the sale of the Embassy building in relation to his buyout of Mr. Mourton's minority interest in BMJ.

{¶17} Mr. Mourton made three substantive claims for relief against Mr. Finn: (1) breach of fiduciary duty, (2) fraud, and (3) negligent misrepresentation. He also sought the alternative remedy of equitable rescission of the sale of the Embassy building to the City of Akron.

FIDUCIARY DUTY

{¶18} His first claim for relief was based on an alleged breach of fiduciary duty. "In order to prevail on a claim for breach of fiduciary duty, a plaintiff must show the existence of a duty that arose from a fiduciary relationship, a breach of that duty, and an injury proximately resulting from the breach of duty." *Park Place Estates Neighborhood L.L.C. v. Oyola*, 9th Dist. No. 25921, 2012-Ohio-908, at ¶ 11 (quoting *Rothschild v. Eckstein,* 9th Dist. No. 09CA009733, 2010–Ohio–4285, ¶ 24). Mr. Finn does not dispute that, as the majority interest holder of BMJ, he owed a fiduciary duty to its minority members. *See Blair v. McDonagh*, 177 Ohio App. 3d 262, 2008-Ohio-3698, ¶ 42 (1st Dist.). He has argued, however, that he fulfilled that duty by telling Mr. Mourton that he would need to sell or lease the building. He has also argued that he owed no fiduciary duty to Mr. Mourton by the time he sold the property to the City because, by that time, he had already purchased Mr. Mourton's interest in BMJ.

{¶19} Mr. Mourton sued Mr. Finn claiming breach of fiduciary duty based on his allegations that Mr. Finn induced him to sell his minority interest in the company for $15,000

while surreptitiously negotiating with the City of Akron for the sale of the company's real property, which netted a profit of over $300,000. Mr. Finn's defense is that he owed no fiduciary duty to Mr. Mourton after September 6, 2007, when the parties executed the buyout agreement, and he did not have a tangible real estate deal with the City of Akron until October 26, 2007. Mr. Mourton argued that Mr. Finn's fiduciary duty extended at least until the consideration had been paid in November 2007. Mr. Finn has also argued that, prior to September 6, 2007, when they signed the buyout agreement, he did not breach his fiduciary duty to Mr. Mourton because he informed him of his intention to sell the property weeks before the parties signed the buyout agreement. Mr. Mourton has testified that Mr. Finn never told him the City or anyone else was interested in buying the Embassy building. He has argued that telling him BMJ would need to sell the building was not the same as telling him that he was actively negotiating a potential deal with the City of Akron.

{¶20} Mr. Finn testified that he began talking to Mr. Mourton about buying his minority interest in the company months before the buyout agreement was finally signed. He testified that they first discussed it in April and the buyout agreement was drafted in June or July, although it was not signed until September. He also testified that his lawyer was conducting the negotiations with the City of Akron regarding the sale of the building, so he was not aware of the details as the negotiations unfolded. Mr. Finn's lawyer testified that he had never informed Mr. Mourton of his ongoing negotiations with the City for the sale of the building because he mistakenly believed that Mr. Finn was the sole owner of the Embassy building.

{¶21} Mr. Finn relies heavily on the evidence that the City of Akron prepared a letter of understanding dated October 26, 2007, containing the first written offer he received for purchase of the building. The record contains evidence, however, that Mr. Finn, through his lawyer, had

begun negotiating with the City about a possible sale of the Embassy building while Mr. Mourton retained his membership interest in BMJ.

{¶22} Mr. Finn testified that he emailed Mr. Mourton on August 14, 2007. In that email, Mr. Finn told Mr. Mourton that he had signed paperwork to buy from the City of Akron a building on Romig Road. He said nothing about attempting to sell the Embassy building to the City as part of that same deal. Mr. Finn wrote that, "I am probably going to lose my ass on the Embassy Building." He explained in the email that, "[b]etween what we owe on the mortgage, the loan for the build-out and real estate commission, I will have to get over a million, one hundred thousand [dollars] to break even." He testified that he later sold the Embassy building to the City for $1.375 million dollars. Although Mr. Finn testified that he could not recall when he and his lawyer started talking to the City about the possibility of the City buying the Embassy building, he testified that his "[b]est guess" would be that it was sometime before he wrote that email to Mr. Mourton on August 14.

{¶23} There is evidence in the record that Mr. Finn and his lawyer met with various City officials to discuss the real estate deal on August 13, 2007, the day before he wrote the email to Mr. Mourton reminding him to sign the buyout agreement and telling him that he expected to lose money on the sale of the Embassy building. Mr. Finn could not remember much about the meeting, but he testified that the conversation with the City officials was mainly focused on BMJ's purchase of the Romig Road property. He said, however, that they may have briefly discussed the City's purchase of the Embassy building. He also testified that, as part of the deal they struck, the City gave Mr. Finn's company, ActionLink, free rent for one year at the Embassy building while the Romig Road building was being prepared for occupancy. Mr. Finn's lawyer testified that the purpose of the August 13 meeting with the City was to

communicate "the elements of the deal that we need[ed] to accomplish . . . [including] selling the [Embassy] building back to the City." In mid-August, according to the lawyer, the City was not agreeing to buy the building, it had merely determined that the combination deal was "worth pursuing." The lawyer testified that he did not reach the point of discussing detailed terms with the City until late September, after Mr. Mourton had left BMJ.

{¶24} David Lietz, a City official, testified that he understood from the beginning that Mr. Finn's purchase of the Romig Road property could not happen without a deal for the City to purchase the Embassy building. He also testified that the structuring of the entire deal took about six to eight weeks and that he spoke about it with Mr. Finn's lawyer about six times over that course of time.

{¶25} There is evidence, however, that Mr. Finn signed a contract to purchase the Romig Road building from the City on August 20, 2007. Mr. Finn's lawyer sent him an e-mail on August 24, 2007, indicating that the Deputy Mayor had told him that there would be no problem coordinating a simultaneous closing for the Romig Road and Embassy buildings and that the City would allow Mr. Finn's company to continue to occupy the building it was purchasing from him until the building he was buying from the City would be ready for occupancy. Mr. Finn testified that he never told Mr. Mourton that the City agreed to buy the building or what price they were discussing. Mr. Finn testified that he did not believe he had any duty to advise Mr. Mourton about the City's intent to buy the building or, at least, he no longer had any such duty by the time the City put its offer in writing in October 2007.

{¶26} The evidence indicates that, on October 26, 2007, the City offered Mr. Finn $1.375 million dollars for the Embassy building. Mr. Finn could not recall when he first learned that the City was willing to pay enough for the building that BMJ would not lose money on the

deal. He testified that, initially, the City had only lukewarm interest in buying it, but later offered $1.1 million, which would have allowed BMJ to break even. Mr. Finn told his lawyer to negotiate further because he wanted $1.45 million dollars for it. Mr. Finn testified that he later accepted the City's $1.375 million-dollar offer. Akron City Council formally approved the purchase in November 2007, and the written agreement for the sale is dated January 23, 2008. Mr. Finn also testified that BMJ received a check for $326,943.78, representing the owner's proceeds after all the mortgages were paid off.

{¶27} Construing the evidence in a light most favorable to Mr. Mourton, there is a genuine issue of material fact remaining for trial regarding whether Mr. Finn breached his fiduciary duty to Mr. Mourton by failing to inform him of his efforts to sell the building to the City, which information may well have impacted Mr. Mourton's decision regarding whether to sell his interest in BMJ. Therefore, the trial court should not have granted summary judgment to Mr. Finn on Mr. Mourton's first claim for relief. I would sustain Mr. Mourton's first assignment of error.

FRAUD

{¶28} In the second count of his complaint, Mr. Mourton alleged that Mr. Finn's fraudulent conduct in failing to disclose his negotiations with the City of Akron induced him to enter into the buyout contract. "The elements of fraud are: (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and

(f) a resulting injury proximately caused by the reliance." *Burr v. Stark County Bd. of Comm'rs*, 23 Ohio St. 3d 69, paragraph two of the syllabus (1986).

{¶29}  In his complaint, Mr. Mourton alleged that Mr. Finn misrepresented the value of BMJ's assets while concealing the fact that he was actively negotiating with the City of Akron for the purchase of the company's real estate.  Mr. Mourton further alleged that he justifiably relied on Mr. Finn's misrepresentations, which he believes Mr. Finn made in order to avoid sharing the profits from the sale of the building.

{¶30}  Mr. Finn wrote Mr. Mourton an email in August 2007 implying that factors such as a "real estate commission" would cause him to "lose" money in the process of selling the building because he would need $1.1 million dollars just to "break even."  In his deposition, Mr. Finn testified that he was just making conversation with Mr. Mourton when he told him he believed he would lose money on the sale of the building.  According to Mr. Finn, he was "just . . . guessing" about whether he would lose money because he did not yet know if the City would pay more than $1.1 million.  When asked why he would be rushing to complete the buyout before the sale of the building if he thought he would lose money on the deal, Mr. Finn explained that he wanted to help Mr. Mourton because he did not believe that Mr. Mourton should have any responsibility for the losses.  Mr. Finn also testified that his lawyer conducted the negotiations with the City and there was no realtor involved.

{¶31}  There is a genuine issue of material fact about whether Mr. Finn concealed the fact that he was moving toward a profitable deal with an interested seller, misled Mr. Mourton into believing that the building was a liability rather than an asset, and rushed to get him out of BMJ before the deal went through in order to deprive Mr. Mourton of his share of the profit.  As reasonable minds could differ regarding whether Mr. Finn committed fraud, the trial court should

not have granted summary judgment on the fraud claim. I would sustain Mr. Mourton's second assignment of error and determine his fourth assignment of error is moot on that basis.

## NEGLIGENT MISREPRESENTATION

{¶32} In his third claim for relief, Mr. Mourton accused Mr. Finn of negligent misrepresentation. In his complaint, Mr. Mourton alleged that Mr. Finn gave him false information about the value of the Embassy building and failed to reveal material information regarding his efforts to close a combined real estate sale/purchase deal with the City of Akron. Construed in a light most favorable to Mr. Mourton, the evidence indicates that a genuine issue of material fact exists regarding whether Mr. Finn negligently misrepresented the value of the Embassy building and the progress of his potential deal with the City of Akron. Therefore, the trial court should not have granted summary judgment to Mr. Finn on the negligent misrepresentation claim. I would sustain Mr. Mourton's third assignment of error.

## MR. MOURTON'S MOTION FOR SUMMARY JUDGMENT

{¶33} I would affirm the trial court's judgment denying Mr. Mourton's motion for summary judgment. Regardless of when Mr. Finn's fiduciary duty to Mr. Mourton terminated, there is a genuine issue of material fact regarding whether he breached it. Therefore, I would overrule Mr. Mourton's fifth assignment of error.

APPEARANCES:

MARK B. WEISMAN, Attorney at Law, for Appellant.

J. REID YODER, Attorney at Law, for Appellees.